**MUNGER CHADWICK, P.L.C.**
National Bank Plaza
333 North Wilmot, Suite 300
Tucson, Arizona 85711
Telephone: (520) 721-1900
Facsimile: (520) 747-1550
John F. Munger *[jfmunger@mungerchadwick.com]*
Adriane J. Hofmeyr *[ajhofmeyr@mungerchadwick.com]*
Arizona State Bar Nos. 003735/025100
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JOSEPH CESARE, a married man in his sole capacity; S.V.A. CORPORATION, an Arizona corporation,<br><br>    Plaintiffs,<br><br>v.<br><br>PIMA COUNTY, a political subdivision of the State of Arizona; *et al*,<br><br>    Defendants. | Case No.: **CV14-02514-TUC-CKJ(EJM)**<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiffs JOSEPH CESARE and S.V.A. CORPORATION hereby oppose the motion to dismiss filed by Defendants Pima County, Pima County Board of Supervisors, Sharon Bronson, Chuck Huckelberry, and Carla Blackwell (collectively "the County") on April 10 2015 (Doc # 36) ("MTD") in response to Plaintiffs' First Amended Verified Complaint (Doc # 31) ("Complaint"). Plaintiffs' opposition is supported by the attached Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    LEGAL STANDARD

*FRCP 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ...

1
2
3
4

claim is and the grounds upon which it rests."[1] *Rule 8* "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."[2]

5
6
7

The pleading standard announced in *Rule 8* "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[3]

8
9

## II.  ARGUMENT

10

### A. <u>SUBJECT MATTER JURISDICTION BASED ON STANDING</u>

11
12
13
14
15

The County begins its motion to dismiss with an assertion that the plaintiffs lack standing to bring several of the claims raised in their first amended complaint.  This argument, however, is based upon a mischaracterization of the plaintiffs' claims, and a misapplication of the case law.

16
17
18
19
20
21
22
23

As an initial matter, economic injury clearly is a sufficient basis for standing. *Central Ariz. Water Conservation Dist. v. United States EPA,* 990 F.2d 1531, 1537 (9th Cir.), *cert. den.*, 510 U.S. 828, 126 L. Ed. 2d 61, 114 S. Ct. 94 (1993).  Thus, courts routinely hold that economic losses due to governmental action confers standing upon the plaintiff.[4]  Moreover, and perhaps most importantly, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a

24
25
26
27
28

---

[1] *Bell Atl. Corv. Twombly*, 550 U.S. 544, 555, 127 L. Court. 1955, 167 L. Ed. 2d 929 (2007).

[2] *Ashcroft v. Iqbal*, 556 U.S. 662 129 S. Ct. 1937, 1949-1950, 173 L. Ed 2d 868 (2009). "In the wake of *Twombly* and *Iqbal,* there has been a rush to the courthouse in a deluge of motions to dismiss that would wash away *Rule 8* if granted by the courts... Expressly stated, the Supreme Court did not intend to create a heightened pleading standard, *Twombly* 550 U.S. at 564-570, but sought to alleviate the expense of prosecuting frivolous law suits, 550 U.S. at 561-564." *Foos v. Raytheon Company*, 2010 U.S. Dist. LEXIS 61335, 4 (decided June 2, 2010).

[3] *Id*. at 1949.

[4] *See, e.g., Clinton v. City of New York,* 524 U.S. 417, 433 (1998) (citing 3 K. Davis & R. Pierce, ADMINISTRATIVE LAW TREATISE 13-14 (3d ed. 1994)).

motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990)).

In this case, because the County has moved to dismiss the plaintiffs' first amended complaint under Rule 12(b) of the Federal Rules of Civil Procedure, the parties and the Court must assume and accept as _absolutely true_ that the County, in order to punish Mr. Cesare for his and his family's support of political candidates disfavored by the County and its current officers, and for Mr. Cesare's questioning of the County's misuse of more than five million dollars in development-impact fees, has engaged in a series of improper acts designed to prevent Mr. Cesare from earning a living in his chosen trade and profession. *See, e.g., Cousins, supra,* 568 F.3d at 1067. In particular, as alleged in the first amended complaint, the County has damaged the plaintiffs by publishing disparaging falsehoods about Mr. Cesare in order to prevent third parties from doing business with the plaintiffs, by causing at least one third party (L.G.I., Inc.) to terminate a highly valuable and profitable contract to purchase 572 lots in the Star Valley development, by refusing to issue building permits for lots owned by the entities in which Mr. Cesare holds an interest (even while _not_ withholding permits for the identically-situated lots in the very same development that are owned by Lennar Home Builders (in which Mr. Cesare does not hold an ownership interest)), by neglecting to perform its duties and obligations in the manner required by law, and by engaging in extortionate behavior in order to force the plaintiffs to pay twice for infrastructure that the County is obligated to fund from monies

already paid by the plaintiffs.[5]  Moreover, the County has gone to extraordinary lengths to tailor its wrongful acts so that the injury would fall primarily or entirely upon Mr. Cesare and those business entities in which he holds an interest.  It is in the light of these established facts that the County's standing argument must be viewed.[6]

To support its argument that the plaintiffs lack standing to bring their claims in this case, the County cites *Albers v. Edelson Technology Partners L.P.,* 201 Ariz. 47, 31 P.3d 821 (App. 2001), for the proposition that "[s]tockholders generally may not bring an action individually where 'gravamen of the complaint is injury to the corporation.'" County Motion, p.5:12-14 (internal quotation marks adjusted).  From this, the County concludes that the plaintiffs in this case must lack standing, inasmuch as one of the entities harmed as a result of the County's unlawful efforts to punish Mr. Cesare's political activities was USH/SVA Star Valley, LLC ("the Master Developer" of the Star Valley development), which is a non-party owned by plaintiff SVA Corporation and Lennar Home Builders.  But the plaintiffs are not seeking redress herein for the injury caused to USH/SVA (though it is, indeed, true that USH/SVA inevitably did suffer harm as a result of the County's campaign against Mr. Cesare); the plaintiffs brought this suit seeking redress for the harm caused *to the plaintiffs* as a result of the County's efforts to prevent Mr. Cesare from earning a living in his trade and profession.  In other words, the County's argument rests upon the erroneous mischaracterization of the plaintiffs' claims as being "derivative" in nature.

---

[5] Citations to the Complaint for all these factual allegations are included below.

[6] Standing is a judicially-created requirement that derives from the "cases-or-controversies" clause found in Article III of the U.S. Constitution that "should not be construed narrowly or restrictively"; it "is not a rigid or dogmatic rule, but is one that must be applied with some view to realities as well as practicalities."  59 AM. JUR. 2d, PARTIES § 35 (2002) (footnotes omitted).

As alleged in the Complaint, the County has been, and is, engaged in a campaign of retaliation and retribution against Mr. Cesare and his family, which the plaintiffs intend to prove at trial.  The goal of this campaign has been to drive Mr. Cesare out of business by inducing third parties to cease and/or refrain from doing business with any entity in which Mr. Cesare has an interest (including plaintiff SVA Corporation, of which Mr. Cesare is the sole shareholder).  Simply because USH/SVA also suffered collateral damage from the County's illegal acts does not mean that USH/SVA somehow is the only possible plaintiff.  In fact, to the extent it was able to do so, the County tailored its attacks so as to focus the injury on Mr. Cesare and _avoid_ injury to other parties that did not commit Mr. Cesare's political offenses.  Thus, the County has, for example, refused to issue building permits for those Star Valley lots in which Mr. Cesare has an ownership interest, but has continued to issue permits for those Star Valley lots owned exclusively by Lennar Home Builders -- even though _all_ of the lots in the Star Valley development are subject to the imagined requirements that the County has cited as a pretext for denying the building permits.[7]  Similarly, the disparaging and defamatory falsehoods that the County published in order to prevent third parties from doing business with the plaintiffs consisted of statements such as the allegation that _Mr. Cesare_ lacked "fiduciary responsibility," the allegation that _Mr. Cesare_ is "harming the [Star Valley] residents' enjoyment of their property," the allegation that _Mr. Cesare_ is negligent, the gratuitous statement that "_Joe Cesare_ is a really tough guy," _etc._[8]  It is _Mr. Cesare_ that the County is trying to drive out of business; the harm to USH/SVA was an unavoidable by-product that the County was

---

[7] Citations to the Complaint follow below.
[8] Citations to the Complaint follow below.

willing to accept.  Or to express the matter in the terms used by the *Albers* court, the "gravamen" of the plaintiffs' claims in this case is the injury to Mr. Cesare and SVA Corporation, not the collateral injury to USH/SVA.

In addition to mischaracterizing the plaintiffs' claims as being "derivative" in nature, the County also misapplies the case law cited in its motion.  In fact, none of the cases cited by the County supports the argument that the plaintiffs lack standing in this case -- and most actually make it clear that the plaintiffs *do* have standing to bring the claims asserted in the first amended complaint.

In the *Albers* case referenced above, the plaintiffs were minority shareholders in a corporation who were suing the majority shareholders for, among other things, mismanagement of the corporation and its patents and other assets.[9] This is *very* different from the present case, where the County, in the course of its attempt to run an individual out of business because of his political activities, caused harm to an entity in which that individual has an interest.  The entity -- USH/SVA in this case -- may have (and, in fact, does have) claims for the collateral injury to the entity, but that does not negate or supercede the direct claims that the targeted persons have for damages that were directed at, and suffered by, them individually.

Moreover, *Albers* goes on to hold that "[a] shareholder *may* maintain a direct action [where] the relationship between the shareholders and a wrongdoer is separate from the shareholders' status as shareholders or their ownership interest in the corporation, [or] the wrongdoer owes a duty to the shareholders for some reason other than their status as

---

[9] *Albers, supra,* 201 Ariz. at 49, ¶5, 31 P.3d at 823, ¶5.

shareholders."[10] The *Hidalgo v. McCauley* case[11] makes the same observation -- that a plaintiff will have standing to bring claims "where there were relations between him and the alleged tortfeasor independent of those which he derived through his interest in the corporate business."[12] That certainly is the case here, where the County, as a governmental body, together with its officers and officials, unquestionably has a relationship with, and owes a duty to, its citizens (including the plaintiffs) that is separate from and independent of their status as interest-holders in USH/SVA.[13]

    *Funk v. Spalding,* 74 Ariz. 219, 246 P.2d 184 (1952), and *Sax v. World Wide Press, Inc.,* 809 F.2d 610 (9th Cir. 1987), both of which also are cited by the County, are similar to *Albers* in that they involved a shareholder suing for mismanagement of a corporation and/or its assets -- which again is not comparable to the County's ongoing campaign against Mr. Cesare and any entity in which he holds an interest. And *Funk* shares an additional similarity with *Albers* in that it recognizes that "a stockholder may sue as an individual where he is directly and individually injured although *the corporation may also have a cause of action* for the same wrong."[14] Thus, *Funk*, like *Albers*, affirmatively makes clear that the plaintiffs *do* have standing to bring the claims asserted in this case.

    Likewise, the County's reliance upon *RK Ventures, Inc. v. City of Seattle,* 307 F.3d

---

[10] *Albers,* 201 Ariz. at 52, ¶18, 31 P.3d at 826, ¶18 (emphasis added), citing *Gemstar Ltd. v. Ernst & Young,* 183 Ariz. 148, 157, 901 P.2d 1178, 1187 (App. 1995).

[11] Cited by the County, MTD, p. 6.

[12] 50 Ariz. 178, 184, 70 P.2d 443, 446 (1937).

[13] The principle that a relationship between a wrongdoer and an injured party that is independent of the injured party's ownership in a corporation will give rise to a direct (as opposed to a derivative) action, even where the wrongdoer's acts also injured the corporation, is not novel. *See, e.g., Gemstar, supra,* 183 Ariz. at 157, 901 P.2d at 1187; *Cowin v. Bresler,* 741 F. 2d 410, 415 (D.C. Cir. 1984); *Williams v. Mordkofsky,* 901 F. 2d 158, 164 (D.C. Cir. 1990).

[14] *Id.,* 74 Ariz. at 223, 246 P.2d at 186 (emphasis added) (quoting *Sutter v. General Petroleum Corp.,* 28 Cal.2d 525, 170 P.2d 898 (1946)).

1045 (9th Cir. 2002), is misplaced, inasmuch as that opinion _supports_ the plaintiffs'

standing in the present case.  In fact, *RK Ventures*, together with *Soranno's Gasco, Inc. v.*

*Morgan,* 874 F.2d 1310 (9th Cir. 1989), upon which *RK Ventures* relies, each was based

upon facts somewhat similar to what transpired in this case -- where the County's desire

for political retribution against Mr. Cesare and his family caused it to impinge upon the

rights of Mr. Cesare _and_ the various entities in which he holds an interest.   In *RK*

*Ventures*, the court noted that "[t]he same conduct may result in injury to both [a]

corporation and the individual shareholders."  307 F.3d at 1057 (citing *Gomez v. Alexian*

*Bros. Hosp.,* 698 F.2d 1019, 1021 (9th Cir. 1983) (*per curiam*)).  The court then went on

to cite *Soranno's Gasco,* 874 F.2d at 1318-19, for the proposition that individual plaintiffs

will have standing where "the complaint allege[s] violations of the rights of both the

corporation and the individual owners."  *Id.*  That is the situation here, where the County

has injured the plaintiffs _as well as_ USH/SVA.

In sum, the injury done to the plaintiffs as a result of the County's publication of

disparaging falsehoods about Mr. Cesare and his business ethics, its refusal to issue

building permits for just those Star Valley lots owned by the entities in which Mr. Cesare

holds an interest, its neglecting to perform its duties and obligations in the manner

required by law, its extortionate behavior, *etc.*, whether or not such injury also was

suffered by USH/SVA or by Lennar Home Builders, was most certainly suffered by Mr.

Cesare and SVA Corporation.  As alleged in the Complaint, Mr. Cesare and SVA

Corporation suffered this injury as a result of the County's campaign to put Mr. Cesare

out of business because of his political activities; it is a real and personal loss to Mr.

Cesare and to SVA Corporation, and the plaintiffs most certainly have standing to seek legal redress therefor.

Statute of Limitations

The County briefly attempts to eliminate representations made by the County at the May 4, 2013 meeting as being outside the "applicable one-year statute of limitations."[15] This position is without merit. The ***damage suffered*** by Plaintiffs as a result of the County's misrepresentations at that meeting only occurred later: the homeowners only threatened in April and May 2014 to "slow sales";[16] LGI only terminated its purchase agreement with the Master Developer and refused to do business with Mr. Cesare in 2014;[17] Lennar only threatened to terminate its partnership with Mr. Cesare in 2015.[18] Until Mr. Cesare suffered such damage, this cause of action had not yet arisen.[19]

## B. SUBJECT MATTER JURISDICTION BASED ON RIPENESS

Defendants argue that Plaintiffs' claims as they pertain to "injury from re-platting, rather than the 'threat' of re-platting"[20] are ***unripe*** because "the staff recommendation to re-plat has been removed from the Board's agenda."[21] Defendants' argument is without merit. First, this is ***not*** a ripeness argument; it is a ***mootness*** argument. Second, the voluntary cessation of wrongdoing does not render a case moot.

"The ripeness and mootness doctrines are based in part upon the Article III

---

[15] MTD, p. 7, fn. 3.
[16] Complaint, ¶ 122.
[17] Complaint, ¶ 131-134.
[18] Complaint, ¶ 169.
[19] A.R.S § 12-821.01(B) ("a cause of action accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition that caused or contributed to the damage.")
[20] MTD, p. 11:22.
[21] MTD, p. 11:17-18.

requirement that courts decide only cases or controversies." *Western Oil & Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1290 (9ᵗʰ Cir. 1990).[22] The <u>ripeness</u> inquiry asks "whether there yet is any need for the court to act," while the <u>mootness</u> inquiry asks "whether there is anything left for the court to do." *Id.* "[T]he law is clear that ***only a previously ripe argument can be moot*** and that no dispute can properly be declared moot when it is likely to recur in later litigation." *Id.*[23]

Actions are not moot when the issues they concern are ***likely to recur***. *Id.* When a controversy is an ***on-going one***, the case has not become moot. *Id.* A case had not become moot because, despite growing accord between the parties, continuing controversy remained. *Id.* "A defendant's ***voluntary cessation of wrongdoing*** does **<u>not</u>** render the case moot because it provides no assurance that the alleged wrongdoing would not recur." *Id.* When the ***possibility of controversy remains***, the case is not yet moot. *Id.* An appeal will not be deemed moot if there is a reasonable likelihood that the parties will ***contest the same issues*** in a subsequent proceeding. *Id.*[24]

"In deciding whether an issue is <u>ripe</u> for review, the court 'evaluates both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id* at 1291. "The court inquires whether the controversy generated is essentially legal in nature or whether further factual amplication is necessary. In addition, we assess potential hardship to the parties if review is denied." *Id.*

Defendants try to argue that any allegations that involve the abandonment and re-platting of Star Valley are "unripe" because the item has been removed from the County's

---

[22] Defendants rely on this case too. MTD, p. 11:11-12.
[23] The court quotes those appellees, then states "We agree with appellees." *Id.*
[24] All emphasis added.

agenda, and "to the extent any of Plaintiffs claims are based on injury from re-platting."[25] Defendants' first argument (that the allegations are unripe because the item has been removed from the agenda) is really a *mootness* argument and is dealt with below. Defendants' second argument (that because the re-platting has not occurred yet, the injury has not occurred yet) is without merit.

On July 1, 2014, the County resolved to "initiate the re-platting process for Star Valley."[26] On July 1, 2014, the County approved a new policy, Policy No. F 53.4, entitled "Subdivision Assurance Agreements – Time Extension, Substitute Assurance and Re-Platting,"[27] which set out the procedure for abandoning and re-platting subdivisions.[28] On July 10, 2014, (within ten days of the new Policy), the County sent a notice in writing to Plaintiffs and the Master Developer advising them of the County's intent to "exercise its option to re-plat" Blocks 4, 7 and 8 of Star Valley.[29] On August 18, 2014, the County approved a resolution "authorizing the abandonment and re-plat of subdivision plats for Star Valley Blocks 4, 7 and 8, to return all or portions of the blocks to the boundary configurations as they existed before the recording of the plats for the blocks."[30]

However, on or about January 20, 2015, the County decided to remove the re-platting "from the Board's agenda,"[31] "pending decisions of the Superior Court."[32]

The County went as far as it could to begin the abandonment and re-platting

---

[25] MTD, p. 11:21-22.
[26] Complaint, ¶ 138.
[27] Complaint, ¶ 139.
[28] Complaint, ¶ 140.
[29] Complaint, ¶ 141.
[30] Complaint, ¶ 144.
[31] MTD, p. 11:18.
[32] MTD, Exhibit 5, p. 4, ¶10.

process, and then, after this litigation was initiated,[33] it decided to put the process on hold "pending decisions of the Superior Court." The abandonment and re-platting was ***not*** put on hold pending resolution of ***this*** case (which is in federal court). It is on hold pending the resolution of a separate lawsuit, in "Superior Court," which has now been settled and dismissed.[34] Plaintiffs' injury arises from the concrete nature of the steps that the County has already taking towards the re-platting.[35] These steps include the ***decision to abandon and re-plat Star Valley***, as well as going so far as to pass ***an ordinance*** for the purpose of empowering itself to abandon and re-plat Star Valley. Current business partners and potential business partners of Plaintiffs ***knew that Star Valley was being brought to a standstill by the County*** through abandonment and re-platting of the development.[36] The uncertainty that Defendants deliberately created around the future of the Star Valley development caused the harm that Plaintiffs allege. The fact that the subdivision has not yet actually been abandoned is irrelevant to Plaintiffs' claims. "Further factual amplication"[37] is not required for this Court to determine the wrongfulness of Defendants' conduct nor the harm to Plaintiffs caused by Defendants' wrongful conduct.

Moreover, by the wording of the minutes themselves, the abandonment and re-platting may be put back on the agenda ***at any time***. Irrespective of which lawsuit was being referred to in the minutes, ***the abandonment and re-platting could be put back on the Board's agenda <u>at any time</u>***. The fact that Defendants "voluntarily ceased" what

---

[33] On December 3, 2014.
[34] Case No. C20145528, dismissed on April 28, 2015.
[35] Complaint, ¶ 147.
[36] Complaint, ¶ 134 (LGI cancelled its contract to purchase a block of lots), ¶ 169 (Lennar threatened to terminate its relationship with Plaintiffs), ¶ 175, ¶ 176.
[37] *Western Oil & Gas, supra.*

Plaintiffs allege as "wrongdoing" does **_not_** render the case moot because it provides no assurance that the alleged wrongdoing will not recur. Not only does the "**_possibility of controversy remain_**," but in fact it is almost a certainty that it will continue.

## C.    FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

To avoid dismissal, a complaint must contain "only enough facts to state a claim for relief that is **_plausible on its face_**."[38] "A claim has facial plausibility when the plaintiff pleads factual content that **_allows the court to draw the reasonable inference_** that the defendant is liable for the misconduct alleged."[39] "The plausibility standard is **_not_** akin to a '**_probability_** requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

On a motion to dismiss under FRCP 12(b)(6), **_all allegations of material fact are assumed to be true_** and construed in the light most favorable to the nonmoving party.[40]

Motions to dismiss for failure to state a claim are **_not favored under Arizona law_**.[41]

1. **Count One: Defamation, Injurious Falsehood, and Negligence**

Defendants argue that because Chuck Huckleberry, Sharon Bronson, and Carla Blackwell are entitled to qualified immunity, and thus Counts One (defamation), Three (injurious falsehood), and Ten (negligence) should be dismissed because the complaint does not state a plausible claim, based on objective facts, that Ms. Blackwell knew her

---

[38] *Twombly, supra,* at 570.
[39] *Iqbal, supra,* at 1949.
[40] *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal* at 1950.
[41] *Maldonado v. S. Pac. Transp. Co.,* 129 Ariz. 165, 167, 629 P.2d 1001 (App. 1981).

statements were false or acted in reckless disregard of the truth.[42]

Defendant's argument rests on an incorrect formulation of the "objective malice test" set forth in *Chamberlain v. Mathis*, 151 Ariz. 551, 729 P.2d 905 (1986).[43]  Defendant argues that "Arizona's qualified immunity law makes clear that allegations of subjective malice are insufficient and the 'reasonableness of [Blackwell]'s conduct should be measured by an objective standard.'"[44]  Defendants then go on to insist that Plaintiff must objectively prove that Ms. Blackwell knew her statements were false.[45]  But that is not the holding in *Chamberlain*.

*Chamberlain* held that for a plaintiff to prevail in a defamation suit against a government official, he must prove that the government official (1) acted outside the outer perimeter of his required or discretionary functions, or (2) acted with malice in that he knew his statements regarding plaintiffs were false or acted in reckless disregard of their truth.  *Id*. at 560, 729 P.2d at 914.  An objective test is applied to determine ***whether a government official acts in reckless disregard of the truth and is inapplicable where he is alleged to have known his statements were false***, and asks whether a reasonable person, having the information available to the official at the time the statements were made, could have formed a reasonable belief that the defamatory statement in question was true and that the publication was an appropriate means for serving the interests which

---

[42] MTD, p. 15:5-8.
[43] Notably, the Defendants are not alleging that Plaintiffs have failed to allege all of the required elements for defamation, injurious falsehood, or negligence, only that Plaintiffs have failed to satisfy the objective malice standard.
[44] MTD, at 14, 17.
[45] MTD, at 15, 17.

1    justified the privilege (the "objective malice test").[46]

2         Plaintiffs, therefore, are not required to set forth facts to objectively prove that Ms.

3    Blackwell knew her statements were false, only that she acted with reckless disregard of

4
5    their truth.[47]

6         Plaintiffs have pleaded sufficient facts, which (accepted as true) state plausible

7    claims for defamation,[48] injurious falsehood,[49] and negligence,[50] because Plaintiffs have

8    alleged, *inter alia*, that Defendants knew Ms. Blackwell's statements were false and/or

9
10   that Defendants acted in reckless disregard of the truth.[51] In fact, the allegations (cited

11   below) show not only that Defendants **knew** their allegations were false, but that

12   Defendants **invented** the allegations over the course of a year. Defendants **invented** a

13   facially legitimate reason to charge Plaintiffs with wrongdoing, so that Defendants could

14
15   shut down Mr. Cesare and his businesses.[52]

16

17   [46] *See id.* at 559, 729 P.2d at 913;  *see also Western Technologies, Inc. v. Neal*, 159 Ariz. 433, 440, 768 P.2d 165, 173
18   (App. 1989) (holding that objective malice standard applies only to second prong of qualified immunity test that
     defendant acted in reckless disregard);  *see also Manriquez v. City of Phoenix*, 2014 U.S. Dist. LEXIS 44549, *39
     (Dist. Ariz. 2014).

19   [47] Plaintiffs certainly are not required to "prove" anything at the pleading stage; only allege sufficient facts, which if
20   accepted as true, would entitle plaintiff to the relief requested. *See Moriarty*, 2014 U.S. Dist. LEXIS 28535 *3 (Dist.
     N.J. 2014) (plaintiffs only required to "plead facts from which malice might reasonably be inferred.").

21   [48] To prevail on a defamation claim against a government official, a plaintiff must prove that the government official
     knowingly made false and defamatory statements about him to others or that he acted in reckless disregard of the
22   truth of those statements.  *Peagler v. Phoenix Newspapers*, 114 Ariz. 309, 560 P.2d 1216 (1977).  Plaintiff's
     complaint alleges all of the elements.  See Complaint, ¶¶ 182 -204.

23   [49] Injurious falsehood "consist[s] of the publication of matter derogatory to the plaintiff's . . . business in general . . .
     of a kind calculated to prevent others from dealing with him or otherwise to interfere with his relations with others to
24   his disadvantage. *Western Technologies v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 4, 739 P.2d 1318, 1321 (App.
     1986).

25   [50] To prevail on a negligence claim, a plaintiff must show that the defendant had a duty to act a certain way, that the
     defendant breached that duty, that the defendant's breach was the actual and proximate cause of plaintiff's damages,
26   and resulting damages.  *Gipson v. Kasey*, 214 Ariz. 141, 150 P.3d 228 (2007).

     [51] The evidence showing the ***falseness*** of the allegations, and the fact that Defendants ***invented*** reasons to punish Mr.
27   Cesare and his entities, and the fact that the County ***knew*** the allegations were false and acted maliciously, are all set
     out in detail on p. 22-25 below.

28   [52] As shown below, it took a whole year of corresponding with Plaintiffs before Defendants charged Plaintiffs with
     violating a ***contractual obligation*** to pay for off-site improvements.

### 2. Count Two: False Light

Defendants argue that Plaintiff has failed to state a claim for false light/invasion of privacy because Mr. Cesare has no privacy rights due to his status as a "public person" and that because the public had a right to know about how he discharged his duties as an officer of the HOA, the County was entitled to respond to HOA member inquiries with knowingly false material or with information that the County had serious doubts about.[53] The County, therefore, argues that as a matter of law, it is entitled to make knowingly false statements to the public because the public asked for it.  This argument has no merit.

A false light tort occurs where "one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."[54] Thus, the tort is established if the defendant knowingly or recklessly published false information or innuendo about the plaintiff that a reasonable person would find highly offensive.[55]

Defendants rely on *Godbehere v. Phoenix Newspapers*, 162 Ariz. 335, 783 P.2d 781 (1989) for the premise that the Defendants are absolved of liability for making false and defamatory statements about Mr. Cesare because he is a public figure and because the statements were matters of public concern.  Defendants' reliance on *Godbehere* is misplaced.

---

[53] MTD, p. 15-17.
[54] *Hart v. Seven Resorts*, 190 Ariz. 272, 280, 947 P.2d 846, 854 (App. 1997).
[55] *Id.*

First, Mr. Cesare is not by any stretch of the law a "public figure."  He is simply a businessman in Tucson.  He has not purposefully thrust himself into a matter of public concern nor is he a public official.[56]   Accordingly, Mr. Cesare's privacy rights are not limited in the same manner as a public figure or official.

Second, even if Mr. Cesare were a public figure, he could still maintain an action for false light.  In *Godbehere*, the court specifically stated that it "[does] not go so far as to say . . . that a public official has no privacy rights at all and may never bring an action for invasion of privacy.  Certainly, if the publication presents the public official's private life in a false light, he or she can sue under the false light tort, although actual malice must be shown."[57]   In other words, a plaintiff who is a public figure can sue under the false light tort where the defendant knew the statements were false or acted in reckless disregard of their truth.  In the present case, Plaintiffs have alleged, and can prove, that Defendants acted with malice when they published their false comments regarding Mr. Cesare.[58]

Third, Plaintiffs may rely on comments made by Defendants at the May 2013 meeting because the damage from those comments only arose in 2014.[59]

## 3.  Counts Six and Eight: Federal and State Equal Protection

In order to state a claim for equal protection (under both the federal and Arizona constitutions), Plaintiffs need to show that, under the rational basis test, a law or regulation imposes a ***burden on one class*** but not another and the legislation does not serve ***a legitimate state interest*** and the facts support the conclusion that the ***classification***

---

[56] *Dombey v. Phoenix Newspapers*, 150 Ariz. 476, 483, 724 P.2d 562, 569 (1986).
[57] *Godbehere*, 162 Ariz. at 343, 783 P.2d at 789.
[58] Citations to the Complaint included below.
[59] As argued above. Defendants attempt to exclude these facts from this Count. MTD, p. 16:23.

*does not rationally further that interest*.[60] The guarantee of equal protection is violated if a classification rests on grounds *wholly irrelevant to the achievement of the state's objective*.[61] A regulation that applies to some members of a class and not to others will not be upheld if the classification is *arbitrary* and there is *not a substantial difference* between those within and without the class.[62]

"Though the law itself be fair on its face and impartial in appearance, yet, *if it is applied and administered by public authority with an evil eye and an unequal hand*, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."[63]

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or *by its improper execution through duly constituted agents*."[64] Therefore, equal protection claims can be brought by a "class-of-one," where a plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[65]

---

[60] *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, ¶ 8, 7 P.3d 136 (App. 2000).
[61] *Id*, ¶ 9.
[62] *Id*, ¶ 9.
[63] *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972), quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374, 6 S. Ct. 1064, 1073, 30 L. Ed. 220 (1886). In *Steele*, the Court held that "The government offered *no explanation* for its selection of defendants, other than *prosecutorial discretion*. That answer simply will not suffice in the circumstances of this case. Since Steele had presented evidence which created a *strong inference of discriminatory prosecution*, the *government was required to explain it away*, if possible, by showing the selection process actually rested upon some valid ground." At 1152 (emphasis added).
[64] *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (emphasis added).
[65] *Id*, at 564.

For an equal protection violation, "at the very least, there must be some respect in which the discretion is being exercised so that the complaining individual is being treated *less favorably than others generally are*."[66]

**The burden lies on the state to show that differential treatment has a rational basis.**[67]

Defendants cite *Engquist v. Oreg. Dept of Agric,*[68] in an attempt to limit the application and scope of the principles set out about (in particular, by the *Olech* case). Defendants attempt to argue that, although the law recognizes that equal protection is violated where a "class-of-one" is irrationally singled out, this principle does not apply where state action involves "discretionary decisionmaking based on a vast array of subjective assessments."[69] Defendants then argue that, *in this case*, they were exercising their "discretionary decisionmaking power" when they sanctioned Plaintiffs' business (and Plaintiffs' business only) by re-platting Star Valley (note: they make no argument to justify the withholding of building permits). This argument does not assist Defendants in the present case.[70]

In the present case, of *all the developments in Pima County* that are in violation of assurance agreements and are thus subject to re-platting, *only Star Valley is being re-*

---

[66] *Towery v. Brewer,* 672 F.3d 650, 661 (9th Cir. 2012).

[67] *Engquist v. Oreg. Dept of Agric.*, 553 U.S. 591, 603 (2008) ("This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it."); *Steele, supra.*

[68] 553 U.S. 591 (2008); MTD, p. 18.

[69] MTD, p. 18-19.

[70] In any event, *Engquist* is distinguishable. In that case, a federal employee filed suit against her employer for violation of her equal protection rights. *Engquist* was decided in the context of "*public employment*," where the Court held that "the government *as employer* indeed has far broader powers than does the government *as sovereign,*" (at 598) and "government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." (At 599.) In the present case, we are dealing with the government as sovereign, and its powers therefore are far more limited than the powers allowed it in *Engquist.*

*platted*.[71] The County itself acknowledged that only Star Valley will be sanctioned by re-platting.[72] Of all the lots in ***the Star Valley development*** whose building permits could be withheld for failure to pay for off-site improvements, ***only the lots in which Joe Cesare has an ownership interest are being withheld.***[73] Building permits are not being withheld for lots at Star Valley owned only by Lennar Homes (Blocks 2, 13 and 18). This is in spite of the fact that, if any money is owing for off-site improvements affected by Star Valley, ***all these blocks would be responsible***. However, Defendants are ***selectively picking only those lots belonging to Joe Cesare's entities*** to punish (by abandonment and re-platting of Blocks 4, 7, and 8) for failure to pay.[74]

The ***only reason*** the County offers (and it pertains ***only to the County's decision to re-plat*** – the County makes no attempt whatsoever to justify why it is withholding ***building permits***) is some new evidence (attached to its motion as Exhibit 6) to show that, by choosing to re-plat only Blocks 4, 7 and 8, it was exercising its "managerial discretion"[75] to enforce some "assurance agreements" that Joe Cesare's entities have apparently violated.[76] This argument lacks merit.

The County claims that it had a legitimate reason to abandon and re-plat only Blocks 4, 7 and 8 at Star Valley,[77] and that reason was set out in a notice sent to Plaintiff

---

[71] Complaint, ¶¶ 276-294, 319-336.

[72] *See* Memorandum of Carmine DeBonis to Chuck Huckelberry dated June 25, 2014, p. 2, **Exhibit A** hereto ("***non-performing subdivisions*** dot the Arizona landscape *as a result of the Great Recession* that began around 2006") (referenced in Complaint at ¶ 286).

[73] Complaint, ¶ 277, 281, 282, 283, 319-336. The only lots at Star Valley for which building permits are being withheld are those in which Mr. Cesare has an ownership interest (Blocks 4, 7 and 8).

[74] Complaint, ¶ 276-294, 319-336.

[75] MTD, p. 19:23.

[76] MTD, p. 20:1, attached to MTD as Exhibit 6.

[77] The ones in which Joe Cesare had an ownership interest (and not Blocks 2, 13 and 18 – which Lennar owned solely and separately).

on July 10, 2014 ("Notice").[78] The Notice claims that the only reason for re-platting was because the Master Developer was "in violation of the terms of the Assurance Agreements."[79] The Notice elaborated that the "decision to initiate its option to re-plat"[80] was based on the following reasons: (1) failure to complete the subdivision improvements within the allotted time; (2) lack of proper assurance agreements and transfer of title of Blocks 4, 7, and 8 without County authorization; (3) failure to comply with transportation financing and implementation plan and associated conditions for re-zoning; and (4) changes in surrounding conditions.[81]

While this may look plausible on the surface, County documents reveal that in fact there was only *one real reason*, and that was to force the owners of Blocks 4, 7, and 8 to *pay extra money for off-site improvements*, over and above the $5,000,000.00 it had already paid in impact assessment fees.[82] This real reason is apparent from a letter dated May 20, 2014,[83] in which the County warned the owners of Blocks 4, 7, and 8 that their blocks were about to be re-platted. It stated that these blocks were in violation of their assurance agreements for two reasons (which mirrored reasons (2) and (3) of the Notice).[84] First, it noted that the title company holding title had changed without the County's permission, which violated the assurance agreements. Second, it demanded

---

[78] MTD, p. 19:19-21; Exhibit 4 thereto and referenced in Complaint at ¶ 141.

[79] Exhibit 4, p. 1.

[80] Exhibit 4, p. 1.

[81] MTD, p. 20:11-15.

[82] Because only Blocks 4, 7 and 8 were ultimately punished (by beginning re-platting), it was clear that it was only the owners of Blocks 4, 7 and 8 who the County expected to pay for such off-site improvement. In other words, other block owners at Star Valley (including Lennar Homes) *were not expected to pay anything*.

[83] This letter is attached hereto marked **Exhibit B.**

[84] The other reasons in the Notice were irrelevant. The first reason applied to *all developments in Pima County* and the County acknowledges it was not the developer's fault but rather resulted from the "*Great Recession.*" *See* Memorandum of Carmine DeBonis to Chuck Huckelberry dated June 25, 2014, p. 2, **Exhibit A** hereto ("*non-performing subdivisions* dot the Arizona landscape *as a result of the Great Recession* that began around 2006."). The fourth reason says nothing at all.

payment for the off-site improvements. Neither of these reasons holds any water as to why *the County treated Joe Cesare's lots differently to other lots at Star Valley, and to other developers in Pima County, who were also in violation of assurance agreements*.

The first alleged violation was *de minimus* - the reason the title companies changed was because the original title company that held title to the development (Title Guarantee Agency of Arizona) closed down and after a period of time was replaced with a new title company (Stuart Title and Trust of Tucson).[85] *This is the only plausible violation of the assurance agreements that the County can allege.* However, it is *de minimus*. One title company was replaced with another, and nothing was affected or changed.

The second alleged violation was bogus and a pretext, and *offered no justification whatsoever for the County to punish only Joe Cesare and no other developer in Pima County*. The second alleged violation was that the owners of Blocks 4, 7 and 8 owed the County additional monies for off-site improvements. (The falseness of this allegation is relevant to most of Plaintiffs' claims and is now set out in detail.)[86] Not only was this allegation false, *but it was in fact manufactured by Defendants*. The owners of Blocks 4, 7 and 8 had *no legal obligation whatsoever* to pay any additional monies for off-site improvements. Not only had they *already paid over $5,000,000.00* in development impact fees, but *no contract* (or transportation financing plan) had ever been signed by and between the parties. The County Administrator (Defendant Chuck Huckelberry) himself acknowledged this fact: "The February 2002 Traffic Impact Analysis was approved in

---

[85] Memorandum of Carmine DeBonis to Chuck Huckelberry dated June 25, 2014, p. 2, **Exhibit A** hereto.

[86] The argument and citations to the Complaint set out here are applicable to (and incorporated in) other parts of this Opposition relating to the falseness of the claim that additional monies was owing to the County for off-site improvements - not only that this claim was false, and that Defendants knew it was false, but also that it was manufactured by Defendants.

July 2002; however, *the Transportation Improvement Financing Plan* for Star Valley was ***not approved*** by the County as stated in the July 8, 2002 letter."[87]

That the County *manufactured* a reason to re-plat only Blocks 4, 7 and 8 at Star Valley is revealed by a detailed review of the County's documents from 2012 to 2015. When the County first started making demands from Mr. Cesare to pay for off-site improvements (over and above the $5,000,000.00 in impact fees) (in November 2012), the County did not give any reasons why this additional monies was owing.[88] In fact, a County employee advised his superiors that Mr. Cesare was *not responsible* for the off-site improvements.[89] Also in 2013, County records show that the County was actively looking for ways to put pressure on *Joe Cesare* to accept responsibility for off-site improvements, when they knew he was not legally responsible. [90]

Then, later in 2013, the County began demanding that the Master Developer "enter into a legally binding agreement;"[91] that the improvements were "contingent upon the developer entering into an agreement" with the County,"[92] that construction would begin "upon reaching a signed agreement with you" (addressed to Mr. Cesare personally);[93] a "draft development agreement" that "should have been completed long ago" was sent to

---

[87] Memorandum of Chuck Huckelberry to the Board of Supervisors dated January 20, 2015, p. 7, attached hereto marked **Exhibit C** (emphasis added).
[88] Complaint, ¶ 60, 68, 74, 75.
[89] Complaint, ¶62. In an internal email dated April 8, 2013, County staff noted that "apparently the list of roads from the 2002 DOT letter were never  formally agreed upon by Joe C., so it may be premature *and not factual to represent those roads that 'Joe is going to build.'*"
[90] Complaint, ¶61. In an internal note dated March 5, 2013, a County employee posed the question: "How can we force them to want Cesare to do more."
[91] Complaint, ¶ 68.
[92] Complaint, ¶ 75.
[93] Complaint, ¶ 77, 78, 81.

Mr. Cesare in May 2013;[94] and in June 2013 the County wrote to Mr. Cesare "regarding the structuring of an agreement ('Transportation Finance Plan') for the financing of road improvements remaining at Star Valley."[95] Note that, up to this point in time, ***never once had the County alleged that a <u>contractual obligation</u> existed which compelled payment of more monies for off-site improvements.***[96]

Then later in 2013, the County came up with a new basis for responsibility. It pointed to an ***ordinance*** to justify its demand for payment (in September 2013).[97]

The first time the County tried to base their demands for payment upon a ***contractual obligation*** was in ***January 2014*** (almost a year and half later). The best "contract" the County could come up with was correspondence between the County and the Master Developer's engineer from October 2002.[98] Note that this 2002 document is the ***only document that the County relies on to show a legal obligation on the part of the Master Developer to pay more monies for off-site improvements***.[99] But the October 2002 correspondence ***was not a contract at all*** and in fact specifically and expressly reserved the right of the Master Developer to "challenge the requirement of off-site improvements as a condition of plat approval."[100] This flimsy letter is all the County has to prove the "truthfulness" of its allegations that Mr. Cesare and his entities are in violation of their assurance agreements and thus the County was justified in ***only re-platting Blocks 4, 7 and 8***, and no one else.

---

[94] Complaint, ¶ 81.
[95] Complaint, ¶ 83.
[96] Complaint, ¶ 85.
[97] Complaint, ¶ 84.
[98] Complaint, ¶ 95-99.
[99] Memorandum of Chuck Huckelberry to the Board of Supervisors dated January 20, 2015, p. 12-13, **Exhibit C** hereto.
[100] Complaint, ¶ 99.

Note that the **sole reason cited by the County for it to single-out only Blocks 4, 7 and 8 for re-platting** was the **failure to pay for these off-site improvements.** However, by the County's own records, **67 other subdivisions in Pima County** were in violation of their assurance agreements too. **25 of these other subdivisions** also required offsite road improvements, but that "the Star Valley development is the only project with a currently confirmed default of the assurance agreement where the developer is disputing its obligation to construct the required improvements."[101] In other words, the **only** reason the County was treating Mr. Cesare's lots differently was because Mr. Cesare refused to pay. But, as has been shown by the County's own records, Mr. Cesare owed the County **nothing**. The County's reason for treating Mr. Cesare differently is bogus.

Regarding the withholding of <u>building permits</u>, the County has offered no justification whatsoever in their MTD. Defendants have therefore **failed to meet their burden** of showing a rational basis for withholding permits, where Plaintiffs have alleged that they are being treated differently from other property owners at Star Valley.[102] In any event, it appears from internal County correspondence and County memoranda that the reason for withholding building permits is (as for the re-platting) that the owners of Blocks 4, 7 and 8 will not pay for off-site improvements.[103] However, not only is this claim false, but in any event the responsibility for those off-site improvements as alleged by the County would apply **equally to all lot-owners at Star Valley,** including the lots owned solely by Lennar Homes.[104] So, even if it were true that Block owners at Star

---

[101] Memorandum of Carmine DeBonis to Chuck Huckelberry dated June 25, 2014, p. 4, **Exhibit A** hereto**.**
[102] See citations to Complaint above.
[103] Memorandum of Chuck Huckelberry dated January 20, 2015, p. 42, **Exhibit C** hereto.
[104] See citations to Complaint above.

Valley owed additional monies for off-site improvements, then why is the County only *withholding building permits for Blocks in which Mr. Cesare has an interest, and not from Blocks owned solely by Lennar Homes*? Because the County is trying to treat Mr. Cesare differently and badly.

**4.  Count Seven and Nine: Federal and State Substantive Due Process**

Defendants attempt to argue that Plaintiffs' substantive due process claims fail because "any alleged injury to Mr. Cesare's profession flows directly from the same facts and injuries alleged in support of Plaintiffs' First Amendment retaliation claim,"[105] and thus that the counts are "duplicative."[106] This argument lacks merit.

> 1.  Pleading in the alternative is permitted

Rule 8(d)(2) expressly permits a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, *the pleading is sufficient if any one of them is sufficient*."[107] Rule 8(d)(3) also permits "inconsistent claims," in that it provides that a party may "state *as many separate claims* or defenses as it has, regardless of *consistency*." Inconsistent pleading is permissible; a party need not elect in advance of trial the theory upon which he will rely or the remedy he will seek, rather, that election can wait until the conclusion of trial.[108] Plaintiff may allege alternative, inconsistent claims, and *such claims must be examined independently.*[109]

---

[105] MTD, p. 24:11-13.
[106] MTD, p. 22:18.
[107] Rule 8(d)(2), *Federal Rules of Civil Procedure*.
[108] *Temple Corporate Office Bldg. v. Arizona Funding Servs., Inc.*, 167 Ariz. 394, 807 P.2d 1130 (App. 1991).
[109] *Independent Enters. v Pittsburgh Water & Sewer Auth.* (1997, CA3 Pa) 103 F3d 1165 (in that case, to determine whether that plaintiff has standing to pursue each claim).

Plaintiffs do not concede that Counts Five and Six (First Amendment retaliation) are inconsistent with Counts Seven and Nine (substantive due process). In fact, there is no inconsistency whatsoever in the facts that Plaintiffs have plead. However, even if they are inconsistent, this is not grounds for dismissal of any of these claims. Whether the *facts that support* Plaintiffs' Counts Five and Six (First Amendment retaliation) *also support* Counts Seven and Nine (substantive due process) is *not the basis for a dismissal of Counts Seven and Nine.* The *facts* may be "duplicative" but the *counts* themselves are not. The counts (First Amendment retaliation and substantive due process) have entirely different elements that a plaintiff must show.

2.    Defendants' conduct rises to the level of a substantive due process violation

To establish a violation of substantive due process, plaintiffs must show that the state action was "*arbitrary* and *irrational*,"[110] and "clearly arbitrary and unreasonable, having *no substantial relation* to the public health, safety, morals, or general welfare."[111] Case law shows that the application of a substantive due process claim is much wider than Defendants attempt to argue:[112] A "*sudden change in course*, *malice*, bias or *pretext*" suggests *constitutional arbitrariness*.[113] "An *arbitrary deprivation of [rights in real property*] may give rise to a viable *substantive due process claim* in any case in which the

---

[110] *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990) (emphasis added).
[111] *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S. Ct. 114, 71 L. Ed. 303, 4 Ohio Law Abs. 816 (1926).
[112] Defendants' reliance on *Albright v. Oliver, supra,* to show that substantive due process protections are "for the most part … accorded to matters relating to marriage, family, procreation, and the right to bodily integrity "(MTD, pp. 22"24-25) is misplaced. It is clear from the case law that follows that courts find substantive due process violations for a wide spectrum of rights violations, ***including property rights***.
[113] *Shanks v. Dressel,* 540 F.3d 1082,1089 (9th Cir. 2008), cited in *Schneider v. County of Sacramento¸* 214 U.S. Dist. LEXIS 116809 (unpublished case from the Eastern District of California).

*Takings Clause* does not provide a preclusive cause of action."[114] The "*invention* of a park *solely* to deny private property holders lawful access to an abutting street is an abuse of governmental power, which . . . rises to the level of a *substantive due process violation.*"[115] A defendant's "**invention**" of an "illegitimate reason to support a land use action and regulation can be *arbitrary and capricious.*"[116] A city's denial of a building permit held to be "arbitrary and irrational" where the city "was *motivated*, *not by legitimate regulatory concerns*, but by *political pressure* from neighbors and other residents of the city."[117] A city council's rejection of a landowner's request to build condominiums because of *pressure* from neighboring landowners *violated due process*.[118] An arbitrary deprivation of a property right might give rise to a substantive due process claim.[119] Actions taken in retaliation for protected activities are improper.[120] A reasonable county official would have been aware that *arbitrary, retaliatory actions* could have *violated plaintiffs' rights*.[121]

In the present case, prior to Ms. Bronson's re-election to the Board of Supervisors in 2012, the County worked cooperatively with Mr. Cesare and all of his respective companies and property developments in Pima County.[122] In other words, leading up to the 2012 elections, the County had no issues with Joe Cesare or his business entities. However, immediately after Defendant Supervisor Sharon Bronson was sworn into office

---

[114] *Action Apartment, 509 F.3d at 1026.*
[115] *Simi Inv. Co. v. Harris Cnty. 236 F.3d 240, 254 (5th Cir. 2000).*
[116] *Merrill v. Cnty. of Madera, No. 1:05-CV-0195 AWI SMS, 2013 U.S. Dist. LEXIS 45974, 2013 WL 1326542 at *7 (E.D. Cal. Mar. 29, 2013)* (unpublished).
[117] *Del Monte Dunes, 920 F.2d at 1508.*
[118] *Del Monte Dunes, 920 F.3d at 1508.*
[119] *Action Apt. Ass'n, 509 F.3d at 1026.*
[120] *Soranno's Gasco, 874 F.2d at 1314.*
[121] *Schneider, supra.*
[122] Complaint, ¶53.

in January 2013, she stated to Mr. Cesare that she was going to "*get even*" with him for supporting a Republican in the 2012 elections, and for not supporting Ms. Bronson (in whose district Star Valley falls).[123] She stated to her co-supervisor, Ally Miller, that she was going to "*get even*" with Mr. Cesare after the 2012 elections.[124] She stated to her staff and colleagues that she was *extremely unhappy* with the fact that Mr. Cesare's son had supported Ms. Miller in the 2012 elections.[125]

After Ms. Bronson's re-election to the Board of Supervisors in 2012, the County began finding any opportunity to obstruct and hinder Mr. Cesare's businesses.[126] Defendants spread defamatory and harmful lies about Mr. Cesare's personal honesty and integrity in correspondence that was sent to 1,400 homeowners at Star Valley, [127] when Defendants *knew* not only that their statements were false,[128] but also that their reasons were *manufactured*.[129] The County began demanding additional monies for off-site improvements of Joe Cesare only *after the 2012 elections*. This shows a *"sudden change in course"* which suggests *constitutional arbitrariness*.[130] The different reasons given to Mr. Cesare for his obligation to pay such monies also changed from 2012 to 2014. This also shows that the final reason (and the one with which the County is sticking) was manufactured and pretextual. Through all of this, the County has exercised one of the most potent powers it has over the Star Valley development and over Joe Cesare – it has been withholding, and continues to withhold, building permits for Blocks 4, 7 and 8 (the

---

[123] Complaint, ¶49, 42-48. These allegations must be taken as true.
[124] Complaint, ¶50.
[125] Complaint, ¶51.
[126] Complaint, ¶53.
[127] Complaint, ¶298, 111-120 (Ms. Blackwell's April 9, 2014 letter).
[128] Complaint, ¶60-90.
[129] See argument and citations to the record above.
[130] *Shanks v. Dressel,* 540 F.3d 1082,1089 (9th Cir. 2008), cited in *Schneider v. County of Sacramento*, supra.

Blocks in which Mr. Cesare has an ownership interest). The denial of building permits that began in 2014 shows a "*sudden change in course*" suggesting *constitutional arbitrariness*,[131] because for 12 years the County has been granting building permits for these Blocks.[132] The County has given *no reason for withholding building permits* in its MTD. It appears its reason is that the Master Developer will not agree to pay for off-site improvements.[133] As shown above, this reason is bogus. Moreover, the County has imposed the *unheard-of and never-before-implemented sanction on a property developer in Pima County* by beginning the process of abandoning and re-platting Blocks 4, 7 and 8 at Star Valley, on the flimsy and manufactured basis that the Master Developer is legally responsible for paying for off-site improvements. The justification offered by the County as to why this would constitute justifiable government discretion is also bogus.[134]

The fact that the County will refuse to issue necessary permits to Joe Cesare and his business entities and can at any moment re-plat his property development has prevented Mr. Cesare from undertaking any further developments or from entering into new partnerships to undertake such developments in Pima County.[135] The County's actions have effectively deprived Mr. Cesare of the ability to continue as a property developer in and around Pima County.[136]

The conduct alleged by Plaintiffs (which must be taken as true) is sufficient to

---

[131] *Shanks v. Dressel,* 540 F.3d 1082,1089 (9th Cir. 2008), cited in *Schneider v. County of Sacramento*, supra.
[132] Complaint, ¶305.
[133] See arguments above.
[134] See arguments above.
[135] Complaint, ¶ 175, 176.
[136] Complaint, ¶301.

show on a balance of probabilities that the County's actions were not motivated by legitimate regulatory concerns, but rather were motivated by malice, political retribution, and retaliation.

## 5. Count Ten: Negligence

Defendants allege that Plaintiffs have not stated a claim for negligence *per se*[137] because "none of the cited authority creates a statutory standard of care" because they do not provide for specific conduct.  Defendants are simply incorrect.

Plaintiff allege that Defendants have very specific constitutional, statutory and regulatory obligations to treat Mr. Cesare fairly, and honestly without improper motive.[138] Simply put, these statutes and policies set forth in the Complaint **require** Defendants to refrain from discharging their duties dishonestly or with improper motive.   Where a statute proscribes certain conduct and calls for damages or criminal liability for the violation thereof, violation of such a statute is negligence per se.[139]

## 6. Count Eleven: State Free Speech

Defendants argue that Count Eleven should be dismissed because Arizona has no counterpart to 42 U.S.C. § 1983 and because no Arizona court has recognized an implied private right of action for damages or for compensation in the event of a violation. Defendants are incorrect.   The United States Supreme Court has previously awarded damages for violation of the first amendment, *see Memphis Cmt. Sch. Dist. v. Stachura*,

---

[137] Defendants do, however, concede that Plaintiffs have stated a claim for a common law negligence claim.  *See* MTD, p. 25:21-23.

[138] Complaint, ¶ 363-367.

[139] *See Steinberger v. McVey*, 234 Ariz. 125, 138-39, 318 P.2d 419, 432,33 (App. 2014) (in establishing negligence per se, jury need only find that party committed the specific act prohibited, or omitted to do the specific act required by the statute or ordinance); *see also Salt River Project v. Vark*, 2010 Ariz. App. Unpub. LEXIS 11, *18 (App. 2010) (negligence per se applicable to violations of statute which prescribes civil penalty).

477 U.S. 299, 306 (1986), and the Arizona Constitution provides even broader free speech protection than the First Amendment. *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 354, 773 P.2d 455, 459 (1989).  The Arizona Supreme Court has extolled the expansive nature of the free speech right granted by the Arizona Constitution and has previously held that it is not limited to suits against government action:

> The first amendment to the United States Constitution provides only a protection against government action.  The words of art. 2, § 6 of the Arizona Constitution, on the other hand, ***directly grant every Arizonan a broad free speech right***. . . .  [T]he words of the Arizona Constitution are too plain for equivocation.  ***The right of every person to freely speak, write and publish may not be limited.***  *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 354, 773 P.2d 455, 459 (1989). (Emphasis added.)

Claims for damages for violation of the First Amendment are authorized under 42 U.S.C. § 1983 specifically because the First Amendment only protects against government action, so section 1983 is necessary to create "a species of tort liability in favor of persons who are deprived of rights . . . secured to them by the Constitution [against individuals who act under color of law]."[140]  Because the Arizona Constitution's free speech component protects against not only government, but ***individual action***, no statute such as section 1983 is required to sue for damages under Arizona's Constitution.

**7.  Count Fifteen: Punitive Damages**

The Defendants also argue that Count Fifteen should be dismissed because it is not an independent cause of action.  Plaintiff did not include this count as an independent cause of action, but merely to separately assert the allegations necessary to support a claim for punitive damages.

---

[140] *See Memphis*, 477 U.S. at 306 (internal citations omitted).

## III.   CONCLUSION

The Court is requested to dismiss Defendants' MTD in its entirety.

RESPECTFULLY SUBMITTED this 22nd day of May, 2014.

MUNGER CHADWICK, P.L.C.

 /s/ John F. Munger
John F. Munger
Adriane J. Hofmeyr
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of the a Notice of Electronic Filing to the following ECF registrants:

Barbara LaWall
Pima County Attorney
Civil Division
Lesley M. Lukach
Kelli L. Olson
Deput County Attorneys
32 N. Stone Avenue, Suite 2100
Tucson Arizona 85701
*Attorneys for Defendants*

By: /s/ Sally Flores